1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                  SOUTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11  JULIUS ZORN, INC., | Case No.:  3:15-CV-02734-GPC-RBB |
| 12                                   Plaintiff, | **CLAIM CONSTRUCTION ORDER** |
| 13  v. | **CONSTRUING DISPUTED CLAIM** |
| 14  MEDI MANUFACTURING, INC. | **TERMS OF U.S. PATENT NO.** |
| 15                                   Defendant. | **7,329,232 B2** |

16

17          The parties, Julius Zorn, Inc. ("Juzo") and CircAid Medical Products, Inc.

18 ("CircAid"),[1] to this patent infringement seek construction of ten claim terms found in

19 U.S. Patent No. 7,329,232 B2, a therapeutic compression device.  The claim construction

20 hearing was held on January 5, 2017.  The parties have submitted a Joint Claim

21 Construction Chart, Dkt. No. 31, and a Joint Claim Construction Worksheet, Dkt. No. 32.

22 The parties' competing claim constructions are detailed in the claim construction briefs

23 submitted by Juzo, Dkt. No. 34, and CircAid, Dkt. No. 33.  Both parties filed responses to

24 one another's proposed claim constructions.  Dkt. Nos. 36, 37.  Having considered the

25

26

27

28

---

[1] On March 1, 2017, the Court granted the parties' joint motion to substitute Medi Manufacturing, Inc. for CircAid Medical Products, Inc. as the Defendant because the two companies recently merged.  Dkt. No. 46.  Although this substitution is now reflected in the case caption, the Court will refer to the Defendant as CircAid, in this order, for the sake of consistency with the claim construction record.

moving papers and oral argument, the Court construes the terms in accordance with the principles set forth by the Federal Circuit on claim construction and orders as follows.

## BACKGROUND

Defendant CircAid holds U.S. Patent No. 7,329,232 B2 ("the '232 patent") entitled "Limb Encircling Therapeutic Compression Device."  Exhibit A, Dkt. No. 35-1 at 15.  The Limb Encircling Therapeutic Compression Device is a "garment" with "inner and outer surfaces" with a "central region of substantially inelastic material."  The '232 Patent at 3:43-46.  The garment contains a "plurality of bands" that extend "from the opposite lateral regions" of the garment so as to "encircle the limb."  *Id.* at 3:47-52.  To use the garment, the user "encircles the limb, the inner surface of the garment placed against the limb, and draws the first lateral region toward the second longitudinal edge to stretch the central region."  *Id.* at 3:52-56.  The effect of this action is to "provide a tension in the garment that will compress the limb."  *Id.* at 3:55-56.  Plaintiff, bringing this suit protectively, argues that its intellectual property does not infringe on CircAid's and that it is entitled to a declaratory judgment of non-infringement.  Dkt. No. 1.

## LEGAL STANDARD

Claim construction is a matter of law to be determined by the court.  *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 838 (2015); *Markman v. Westview Instr., Inc.*, 517 U.S. 370, 372 (1996).  The purpose of claim construction is for the court to "determin[e] the meaning and scope of the patent claims asserted to be infringed."  *O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (citing *Markman*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc)).  "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).  As such, claims are to be construed in a manner that "stays true to the claim language and most naturally aligns with the patent's description of the invention."  *Id.* at 1316.

1    To construe disputed terms, the court first looks to the claims themselves. *See*

2  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed.

3  Cir. 2004). Generally, claim language is given its "ordinary and customary meaning,"

4  which is "the meaning that the term would have to a person of ordinary skill in the art in

5  question at the time of the invention." *Phillips*, 415 F.3d at 1312-13. In cases where the

6  "ordinary and customary meaning" is clear, claim construction involves "little more than

7  the application of the widely accepted meaning of commonly understood words." *Id.* at

8  1314. "The ordinary and customary meaning of a claim term is the meaning that the term

9  would have to a person of ordinary skill in the art in question at the time of the

10  invention." *Id.* at 1313. In cases where it is not immediately apparent what a person of

11  ordinary skill in the art would understand a claim to mean, the court looks to other

12  sources to decipher the correct meaning. *Id.* at 1314. Those sources include intrinsic and

13  extrinsic evidence "available to the public that show what a person of skill in the art

14  would have understood disputed claim language to mean." *Id.* "Importantly, the person

15  of ordinary skill in the art is deemed to read the claim term not only in the context of the

16  particular claim in which the disputed term appears, but in the context of the entire

17  patent, including the specification." *Id.* at 1313.

18    When such clarity is required, a court begins by examining the intrinsic record,

19  consisting of the language of the claims, the patent specification and, if in evidence, the

20  prosecution history of the challenged patent. *Id.* at 1314; *see also Vederi, LLC v. Google,*

21  *Inc.*, 774 F.3d 1376, 1382 (Fed. Cir. 2014). "The appropriate starting point . . . is always

22  with the language of the asserted claim itself." *Comark Comms., Inc. v. Harris Corp.*,

23  156 F.3d 1182, 1186 (9th Cir. 1998). The context in which a disputed term appears often

24  provides substantial guidance as to the meaning of the term. *See Philips*, 415 F.3d at

25  1313-14. A disputed term must be construed "consistently with its appearance in other

26  places in the same claim or in other claims of the same patent." *Rexnord Corp. v.*

27  *Latiram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001). "A claim construction that gives

28

1   meaning to all the terms of the claim is preferred over one that does not do so." *Vederi*,

2   774 F.3d at 1383.

3        As for other intrinsic evidence, the specification "is always highly relevant to the

4   claim construction analysis" and "usually dispositive." *Philips*, 415 F.3d at 1315.  In

5   fact, it has been observed that "[a]part from the claim language itself, the specification is

6   the single best guide to the meaning of a claim term." *Vederi*, 774 F.3d at 1382; *see also*

7   *Philips*, 415 F.3d at 1315.  "[A] claim construction that excludes [a] preferred

8   embodiment [described in the specification] is rarely, if ever, correct and would require

9   highly persuasive evidentiary support." *Adams Respiratory Therapeutics, Inc. v. Perrigo*

10  *Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010).  Furthermore, the "written description part of

11  the specification" should not be read to "delimit the right to exclude [as] [t]hat is the

12  function and purpose of claims." *Markman*, 52 F.3d at 980.  Stated differently, a "claim

13  construction must not import limitations from the specification into the claims." *Douglas*

14  *Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1342 (Fed. Cir. 2013).  It is,

15  therefore, "improper to read limitations from a preferred embodiment described in the

16  specification—even if it is the only embodiment—into the claims absent a clear

17  indication in the intrinsic record that the patentee intended the claims to be so limited."

18  *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1327 (Fed. Cir. 2012) (citations omitted).

19       "A patentee is," however, "free to be his own lexicographer." *Markman*, 52 F.3d

20  at 980.  Where the inventor gives a term a special meaning, "the inventor's lexicography

21  governs." *Philips*, 415 F.3d at 1316.  Similarly, where the inventor specifically disclaims

22  a certain scope in the specification, that disclaimer is dispositive. *Id.*

23       Generally speaking, "an analysis of the intrinsic evidence alone will resolve any

24  ambiguity in a disputed claim term." *See Vitrionics Corp. v. Conceptronic, Inc.*, 90 F.3d

25  1576, 1583 (Fed. Cir. 1996).  Where that is the case, "it is improper to rely on the

26  extrinsic evidence" as "[t]he claims, specification, and file history, rather than extrinsic

27  evidence, constitute the public record of the patentee's claim, a record on which the

28  public is entitled to rely." *Id.*  However, to the extent "the intrinsic record is ambiguous,

and when necessary," a court "may rely on extrinsic evidence, which consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries and learned treatises." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1360 (Fed. Cir. 2013). Extrinsic evidence, however, is "less significant than the intrinsic record" and "less reliable than the patent and its prosecution history in determining how to read claim terms." *Phillips*, 415 F.3d at 1317-18 (internal quotations and citation omitted).

Finally, "terms do not need to be construed [where] they are neither unfamiliar to the jury, confusing to the jury, nor affected by the specification or prosecution history." *See Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 528 F. Supp. 2d 967, 976 (N.D. Cal. 2007) (citing *United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy.")). But where the parties dispute the scope of a claim term, it is the court's duty to resolve the dispute. *O2 Micro*, 521 F.3d at 1362.

## DISCUSSION

The disputed terms are as follows: (1) "substantially inelastic material" (Claim 1); (2) "flat central region" (Claim 1); (3) "lateral regions disposed on opposite sides of the central region" (Claim 1(a)); (4) "a plurality of bands extending from lateral margins disposed at opposite edges of said opposite lateral regions wherein the bands extending from the opposite lateral regions are juxtaposed to pass between one another" (Claim 1(b)); (5) "proximal and distal edges" (Claim 1(b)(ii)); (6)"one or both edges comprise a curve or indentation" (Claim 1(b)(ii)); (7) "the central and lateral regions are biased into a three-dimensional curvature (Claim 2); (8) substantially perpendicular" (Claims 3, 6); (9) "said angle is independently selected for each band" (Claim 5); (10) "each of said bands"/ "said opposing bands"/ "said plurality of bands" (Claims 1(b), 3, 4, 5). The Court will address each in turn.

### 1. "substantially inelastic material"

Juzo proposes that the claim be construed as "indefinite" or, in the alternative, that it be construed to mean "material that has essentially zero stretch." Dkt. No. 31 at 2. Specifically, Juzo argues that "[a]ny construction that allows a percentage of stretch other than essentially zero is contrary to the plain meaning and is unsupported by the intrinsic evidence, while any construction (or non-construction) that leaves the amount of stretch undefined and uncertain lacks the requisite clarity of claim scope and renders the claims invalid as indefinite." Dkt. No. 34 at 7. CircAid, by contrast, contends that no construction is necessary as the term should be given its "plain meaning." *Id.* Because the parties dispute the scope of the claim term, the Court must resolve the dispute as a matter of law. *See O2 Micro*, 521 F.3d at 1361.

The central disagreement between the parties concerns whether or not the claim "substantially inelastic material" can include material with some limited stretch or elasticity. For the reasons stated below, the Court concludes that the plain and ordinary meaning of "substantially inelastic material," which is the meaning the term would have to a person skilled in the art after reviewing the intrinsic record, is broad enough to include fabric with limited stretch or elasticity and is not, otherwise, indefinite. *See O2 Micro*, 521 F.3d at 1360 ("Words of a claim are generally given their ordinary and customary meaning, which is the meaning a term would have to a person of ordinary skill in the art after reviewing the intrinsic record at the time of the invention.")

The term "substantially inelastic material" appears in Claim 1 as follows: "a flat central region having inner and outer surfaces, said central region comprising substantially inelastic material." The '232 Patent at 16:9-10. Claim 1 does not define the term "substantially inelastic material." The Court also notes that nothing in the claim language requires that substantially inelastic material be fabric with essentially zero stretch or otherwise suggests that substantially inelastic material must have only negligible stretch characteristics. *See generally* the '232 Patent at 16:6-28. The Court further concludes that the word "substantially" is a meaningful modifier that allows for

6

deviation from the word it seeks to modify.  *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 355 F.3d 1361, 1368-69 (Fed. Cir. 2004).  Here, "substantially" modifies "inelastic."  As such, the plain and ordinary meaning of the phrase "substantially inelastic material" is broad enough to include fabrics with some, limited, elasticity or stretch.  *See Philips*, 415 F.3d at 1314 (where the ordinary meaning as understood by a person of skill in the art is "readily apparent even to lay judges," claim construction "involves little more than the application of the widely accepted meaning of commonly understood words.").

Juzo nonetheless argues that its proposed construction is the only one that is faithful to the claim language and supported by the intrinsic record because the specification "clearly states that 'substantially inelastic material' does not stretch, and that even slightly elastic materials are excluded from its scope." Dkt. No. 34 at 7.  The Court disagrees.  Notwithstanding Juzo's protestations to the contrary, the specification's description of the preferred embodiments states quite the opposite.  In fact, the specification specifically provides that "[n]eoprene fabric is particularly advantageous in that *stretch characteristics* permit it to shape, mold, and conform to the body, while applying a near inelastic compression to the body part." *See* the '232 Patent at 9:21-42.  The specification also refers to Velcro 3610 and Velcro 3800 as being preferred fabrics and describes both as being "flexible" and the latter, specifically, as having "limited stretch." *See* the '232 Patent at 6:49-56 ("In one mode of fabrication, the therapeutic compression garments shown in FIG. 1, FIG. 3, and FIG. 5 are made in one piece from a flexible, foldable hook and loop type fabric (e.g. Velcro ™) having an outer loop surface which is preferably a light weight loop fabric of the type designated Velcro 3610 or Velcro 3800, the former being substantially inelastic and the latter having *a limited stretch* at least in the vertical or longitudinal direction.")

In other words, the specification unmistakably contemplates the use of fabric with some elasticity or stretch for use in the preferred embodiments. *See id.* at 6:56-59 ("Other suitable materials range from *inelastic* to those with *some elasticity* such as neoprene that has a small amount of elasticity especially in the longitudinal but also

circumferential axis.")  If the Court were to construe "substantially inelastic material" as "material that has essentially zero stretch," as Juzo proposes, then many of the preferred embodiments — described as having some stretch or elasticity — would be read out of the patent.  Such a construction, however, is highly disfavored.  "[A] claim construction that excludes [a] preferred embodiment [described in the specification] is rarely, if ever, correct and would require highly persuasive evidentiary support."  *See Adams Respiratory*, 616 F.3d at 1290.

Juzo has not offered the highly persuasive evidentiary support needed to convince the Court that the correct claim construction reads out the preferred embodiments and warrants a departure from the plain and ordinary meaning of the term.  In support of its position, Juzo contends that the above-mentioned portions of the specification should be disregarded because CircAid, despite discussing materials with semi-elastic, limited stretch, and elastic properties,[2] only claimed "substantially inelastic material."  *See* Dkt. No. 34 at 8.  But this argument hinges on a predicate that the Court rejects.  Juzo avers that the term "substantially inelastic material" cannot include material with limited stretch or greater because the patent only provides one example of material that is "substantially inelastic," and that material is Velcro 3610.  *See* Transcript of Oral Argument, Dkt. No. 43 at 4-5.  Thus, because Velcro 3610 has "no material stretch"[3] Juzo argues that the claim term must be defined as having the stretch properties of Velcro 3610.  *Id.*

The Court, however, is not persuaded that the patent has only provided one example of "substantially inelastic material."  Just because the specification describes one type of fabric (namely, Velcro 3610) as "substantially inelastic" does not mean that every other material described in the preferred embodiments is not "substantially inelastic."  In

---

[2] The specification's problematic description of "elastic" materials is discussed in greater detail below.
[3] Juzo provided Defendant and the Court with a sample of Velcro 3610 at oral argument.  Moreover, Defendant did not dispute that Velcro 3610 is correctly characterized as having "no material stretch."

8

fact, such a reading is highly circumspect in light of the specification's identification of neoprene and Velcro 3800, two fabrics described by the patent as having more stretch that Velcro 3610, as preferred fabrics. That, it would seem to the Court, is an equally clear indication that the patentee intended materials with limited stretch or some elasticity to be covered by the claim's scope.

That being said, in drawing this conclusion, the Court is not blind to the fact that the specification's description of preferred materials sends mixed signals. On the one hand, it explains that suitable fabrics are those than range from "inelastic to those with some elasticity such as neoprene." The '232 Patent at 6:56-59. Yet on the other hand, the specification also describes various preferred embodiments as having (1) "a central region 10 made of a *semi-elastic material* such as neoprene and essentially inelastic band"; (2) as being "*made from an elastic fabric* or an inelastic Velcro-loop type fabric or combination of both"; or (3) as being "made from an *elastic Neoprene fabric* or an *inelastic Velcro-loop type fabric* or combination of both"). *Id.* at 10:61-65, 10:5-7, 10:18-20.

At most, however, Juzo's citation to these and other passages demonstrates that the specification is ambiguous as to the stretch characteristics encompassed by "substantially inelastic material," not that the specification is clear-as-day that any material with limited stretch is not included in the claim scope. Ambiguous language in the specification, however, is not sufficient to support a disavowal. *See Poly-America, L.P. v. API Industries, Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016) (observing that the "standard for disavowal is exacting, requiring clear and unequivocal evidence that the claimed invention includes or does not include a particular feature."). As such, because Juzo's argument does not provide clear and unequivocal evidence that the scope of the term "substantially inelastic material" excludes fabric with limited stretch or greater, the Court rejects Juzo's proposed construction, which unnecessarily limits the plain and ordinary meaning of the term. *See Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1357 (Fed. Cir. 2004) ("a patentee may claim an invention broadly and expect enforcement of

the full scope of that language absent a clear disavowal or contrary definition in the specification.").

The Court is also not persuaded by Juzo's argument that this term is indefinite under 35 U.S.C. § 112.[4]  As Juzo points out, a claim is indefinite if it "fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  Dkt. No. 34 at 16 (citing *Nautilus, Inc. v. Biosig Instruments*, 134 S. Ct. 2120, 2124 (2014)) (emphasis omitted).  "Reasonable certainty," however, does not require that a claim provide "absolute or mathematical precision."  *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370-71 (Fed. Cir. 2014).  All that is required is that the claim language allow a person of ordinary skill to discern from the claims and specification what the bounds of the claim are to a reasonable certainty.  *Id.* at 1382.  Stated differently, there must not be a "zone of uncertainty" regarding claim scope.  *Nautilus*, 134 S. Ct. at 2129.

Juzo contends that the plain and ordinary meaning of "substantially inelastic material" renders the term indefinite because its leaves a "zone of uncertainty" as to the degree of elasticity that is covered or not covered by the claim.  *See* Dkt. No. 34 at 9.  The Court disagrees.  The Federal Circuit has oft-observed that the term "substantial" is a "meaningful modifier implying 'approximate,' rather than 'perfect,'" and that such modifiers are "descriptive terms commonly used in patent claims to avoid a strict numerical boundary to the specified parameter."  *Liquid Dynamics, Inc.*, 355 F.3d at 1368.  The Court, therefore, rejects Juzo's contention that just because the term "substantially inelastic" does not make clear what numerical degrees of elasticity are covered, that the term is somehow indefinite.  *See id.*; *see also Cordis Corp. v. Medtronic Ave., Inc.*, 339 F.3d 1352, 1361 (Fed. Cir. 2003) (concluding that "substantially uniform thickness" should be interpreted as "of largely or approximately uniform thickness"

---

[4] "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention."

1   unless other intrinsic evidence imposes a "clear and unmistakable disclaimer" requiring a

2   narrowing of the language); *Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340

3   F.3d 1298, 1311 (Fed. Cir. 2003) (finding that nothing in the record clearly limited the

4   scope of "generally parallel" to the point that the adverb should be read to not broaden

5   the meaning of parallel).  Accordingly, the Court concludes that the term "substantially

6   inelastic" is not indefinite or, at the very least, that Juzo has not carried its burden to

7   demonstrate that the term is invalid for indefiniteness.  *See Microsoft Corp. v. I4I Ltd.*

8   *P'ship*, 564 U.S. 91, 97 (2011) (the party asserting invalidity must show it by clear and

9   convincing evidence).

10       In sum, the Court agrees with CircAid that Juzo's proposed construction narrows

11   the plain and ordinary meaning, as understood by a person skilled in the art, of the term

12   "substantially inelastic material."  The term "substantially inelastic material" covers

13   material with some stretch or elasticity, as the term "substantially" is a well-understood

14   modifier that allows for some deviation from the word it seeks to modify.  *See Liquid*

15   *Dynamics*, 355 F.3d at 1368-69.  Accordingly, the Court construes "substantially inelastic

16   material" as "largely but not wholly inelastic material."  *See York Products, Inc. v.*

17   *Central Tractor Farm & Family Center*, 99 F.3d 1568, 1573 (Fed. Cir. 1996)

18   (recognizing that a plain and ordinary meaning of "substantially" includes "largely but

19   not wholly that which is specified").[5]

20       **2. "flat central region"**

21       Juzo contends that this term is indefinite or, in the alternative, that it should be

22   construed as "the region including the entire central axis of the garment running from the

23   top to the bottom of the garment is level or even without raised areas or indentations

24   when the garment is laid out."  Dkt. No. 34 at 9.  By contrast, CircAid argues that the

_____

[5] The Court has construed the present term in accordance with the principles set forth by the Federal
Circuit.  To the extent that the Court's claim construction presents any invalidity issues, Juzo may
appropriately address the issue at a later stage of the proceedings.

1  term "flat" should be construed as "non-tubular" and that "central region" does not
2  require further construction.  Dkt. No. 33 at 9.  Because the parties dispute the scope of
3  the claim term, the Court must resolve the disagreement as a matter of law.  *See O2*
4  *Micro*, 521 F.3d at 1361.

5  Here, the crux of the parties' dispute concerns whether or not the intrinsic record
6  provides sufficient evidence to justify departing from the plain and ordinary meaning of
7  "flat" and adopting CircAid's proposed construction of "non-tubular."  For the reasons
8  that follow, the Court finds that the term "flat" does not mean "non-tubular," a term of
9  substantially greater scope than the plain and ordinary meaning of the term.  The Court
10 also rejects Juzo's construction of "flat" as overly-restrictive and, instead, concludes that
11 the term "flat" bears its plain and ordinary meaning, as understood by a person of
12 ordinary skill in the art in light of the claims and specifications.  *See O2 Micro*, 521 F.3d
13 at 1360 ("Words of a claim are generally given their ordinary and customary meaning,
14 which is the meaning a term would have to a person of ordinary skill in the art after
15 reviewing the intrinsic record at the time of the invention.")

16 The Court begins, as it must, with the claim language.  Claim 1 states that the
17 present invention is a garment "comprising: a *flat central region* having inner and outer
18 surfaces, said central region comprising substantially inelastic material, and lateral
19 regions disposed on opposite sides of the central region."  The '232 patent at 16:8-11
20 (emphasis added).  There is nothing in the language of claim 1 that broadens the meaning
21 of "flat" to mean "non-tubular."  *See* the '232 Patent at 16:6-27.

22 CircAid argues, however, that its proposed construction is nonetheless supported
23 by the claim language because "garments that are contoured to fit the body part are not
24 merely disclosed, but are the preferred embodiment."  Dkt. No. 33 at 10.  Indeed, the
25 specification does repeatedly explain that the garment is designed to conform to the
26 shapes of body parts.  *See* the '232 Patent at 13:55-14:2 ("The therapeutic compression
27 garment of FIG.10 consists of a central region . . . *that accommodates the limb shape* . . .
28 Darts may be cut into a single piece of fabric to *create a central region that*

1   *accommodates the limb shape*. Darts or seams are sewn into the central region *enable the*

2   *garment to conform to the bent shape* of an arm at the elbow, the leg at the knee, or

3   another jointed body part.") (emphasis added); *see also id.* at 14:2-13 ("Also, by varying

4   the width of the central region, the garment would be formed to taper, or otherwise vary

5   in circumference, in order to conform to the shape of the body part. . . . The darts are

6   closed by sewing the curved edges together, *creating a bend or limb-accommodating*

7   *contour* in the finished garment so that when the lateral regions are wrapped around and

8   towards each other, the central and lateral regions are biased into a three-dimensional

9   curvature in order to fit the body part.") (emphasis added).  Thus, because garments that

10  can accommodate limb shapes are preferred embodiments, *see* the '232 at 3:57-59,

11  CircAid argues that the Court should adopt its proposed construction because Juzo's

12  proposed construction reads out those preferred embodiments.

13          As an initial matter, the Court agrees with CircAid that Juzo's proposed

14  construction essentially reads out a preferred embodiment.  "[A] claim construction that

15  excludes [a] preferred embodiment [described in the specification] is rarely, if ever,

16  correct and would require highly persuasive evidentiary support."  *See Adams*

17  *Respiratory*, 616 F.3d at 1290.  Juzo argues that its proposed construction comports with

18  the generally understood meaning of "flat."  *See* Dkt. No. 11 at 34.  Juzo seeks to

19  construe flat as "level or even *without raised areas or indentations when the garment is*

20  *laid out*."  This additional language, however, is unnecessarily limiting.

21          For one, the Court finds no support for the addition of "without raised areas or

22  indentations" in the claim language.  The Court further notes that the addition of the word

23  "indentation" would actually add confusion and ambiguity to the claim terms because the

24  word "indentation" already appears in claim 1 in the context of the present invention's

25  plurality of bands.  *See* the '232 patent at 16:19-20 ("wherein one or both edges comprise

26  a curve of indentation.")  Two, there is no support for this additional language in the

27  specification.  Juzo suggests that its definition is supported by FIG.8, which depicts "a

28  level or even sheet of material when the garment is laid out" with "no raised portions,

1  curved sections, indentions or the like." *See* Dkt. No. 34 at 12.  Yet because it is not
2  proper to read limitations from the preferred embodiments into the claim terms, the Court
3  rejects Juzo's attempt to do so here.  *See Douglas Dynamics*, 717 F.3d at 1342 ("a claim
4  construction must not import limitations from the specification in the claims.")

5      While the Court agrees with CircAid that the specification cuts against Juzo's
6  proposed construction, it nonetheless rejects CircAid's argument that there is sufficient
7  intrinsic evidence to support construing "flat" as "non-tubular."  The specification
8  language that CircAid relies upon, *see supra*, establishes that the present invention
9  includes garments with some three-dimensional shape, but it does not rise to the level of a
10  disclaimer of the plain and ordinary meaning of "flat" and an embrace of a word that
11  nearly means the opposite, "non-tubular."  Put simply, the specification reveals no intent
12  to give the term "flat" a special meaning.  *See Philips*, 415 F.3d at 1316 (inventor's
13  lexicography governs where term given special meaning).

14      The Court is also unconvinced that the prosecution history provides the support
15  needed to provide "flat" with any special meaning.  CircAid argues that the prosecution
16  history lends support to its construction of "flat" as "non-tubular" because the term "flat"
17  was added to the claims in order to distinguish the present invention from prior art
18  devices that were tubular.  Dkt. No. 33 at 9.  CircAid's argument places a particular
19  emphasis on the Fowler garment, U.S. Patent No. 3,856,008, which was a "tubular
20  garment" that had a central region that was a "wall of a long hollow cylinder," which by
21  definition is "arcuate or curved."  *Id.*



22
23
24
25
26
27
28

14

The Fowler garment, U.S. Patent No. 3,856,008, Dkt. No. 33-4 at 2.  Accordingly, CircAid contends, because "it is clear from the patent that 'flat' was added to distinguish the invention from tubular prior art . . . 'flat' should be construed as 'non-tubular.'"  Dkt. No. 33 at 11.

However, that the patent writer added the term "flat" in order to differentiate the present invention from prior art, which was tubular, does not mean that the patentee surrendered only tubular garments when claiming the present invention.  "[T]here is no principle of patent law that the scope of a surrender of subject matter during prosecution is limited to what is absolutely necessary to avoid a prior art reference that was the basis for an examiner's rejection.  To the contrary, it frequently happens that patentees surrender more through amendment than may have been absolutely necessary to avoid particular prior art."  *Norian Corp. v. Stryker Corp.*, 432 F.3d 1356, 1361 (Fed. Cir. 2005).

Here, by describing the present invention as a garment with a "flat central region" and providing for three-dimensionality in order to fit the body part, the patentee limited the claim beyond what was necessary in order to overcome prior art.  CircAid cannot, therefore, now argue that a broader construction was contemplated in light of the prosecution history.  *See id.* at 1362; *see also Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1371 (Fed. Cir. 2004) ("The district court was not free to attribute new meaning to the term or to excuse the patentee from the consequences of its own word choice."); *Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1114-15 (Fed. Cir. 2002) (rejecting patentee's argument that "bonus points" should be read broadly based on efforts to distinguish the invention from prior art).  Accordingly, the Court concludes that the patentee surrendered any garment that does not have a "flat central region" as that term would have been understood by a person of ordinary skill in the art, after consideration of the claim language and specification.

Ultimately, the plain and ordinary meaning of a term must be understood through the lens of a person with ordinary skill in the art upon review of the intrinsic record.  *See*

*O2 Micro*, 521 F.3d at 1360.  Thus, the Court must construe the ordinary meaning of flat in light of, not in spite of, the specification's clear intent to include garments that are contoured to accommodate a limb.  Accordingly, the Court concludes that the plain and ordinary meaning of "flat" must be broad enough to encompass a small degree of three-dimensionality.  Thus, the Court construes "flat" as "level when laid out, allowing for three-dimensionality in order to fit the body part."

### 2a. "central region"

Juzo further contends that the Court needs to construe the term "central region" in addition to the term "flat."  Juzo argues that the term needs construction because the boundaries of the central region inform what region must be "flat" and to what region the "plurality of bands" must fasten.[6]  As such, Juzo proposes construing "central region" to mean "the entire central axis of the garment running from the top to the bottom of the garment."  *See* Dkt. No. 33 at 13-14.  CircAid contends that the term need not be construed because a juror would understand its plain and ordinary meaning.  *See* Dkt. No. 36 at 6.

It is worth reiterating that "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question." *Phillips*, 415 F.3d at 1313.  Moreover, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id.* Here, the Court agrees with Juzo that the meaning of "central region," when read in light of the claim terms and the specification, must include the entire longitudinal axis of the garment.

---

[6] *See* the '232 Patent at 16:12-17 ("a plurality of the bands extending from lateral margins . . . wherein the bands extending from the opposite lateral regions are juxtaposed to pass between one another and fasten onto the flat central region of the garment.")

1    The '232 patent describes the invention as having only three regions, a single

2  "central region" and two "lateral regions."  *See* the '232 patent at 16:5-65.  Claim 1

3  describes the garment as having a "flat central region . . . and lateral regions disposed on

4  opposite sides of the central region."  The '232 patent at 16:8-11.  Claim 2 describes the

5  garment as "claim 1 wherein the central and lateral regions are biased into a three-

6  dimensional curvature."  *Id.* at 16:28-30.  The claim language makes no reference to any

7  other region.  Likewise, the specification and all of the preferred embodiments do not

8  speak of any other region.  As such, the Court finds that a person of ordinary skill in the

9  art would understand the term "central region" to be mutually exclusive of the "lateral

10  regions" and to include the entire central axis of the garment.  If the central region did not

11  run the longitudinal length of the garment, then there would be additional regions resting

12  above and below the "central region" that are not encompassed by the "lateral regions"

13  and that are not described anywhere else in the patent.  Accordingly, the Court concludes

14  that a person of ordinary skill in the art would understand the plain and ordinary meaning

15  of "central region," when read in light of the claims and specification, to include the

16  region comprising the entire longitudinal axis.  As such the Court construes "central

17  region" as "the central region, including the entire longitudinal axis of the garment."

18    In sum, the Court construes "a flat central region" as "a central region, including

19  the entire longitudinal axis of the garment, that is level when laid out, allowing for three-

20  dimensionality in order to fit the body part."[7]

21    / / / /

22    / / / /

23

24

---

25  [7] The Court has construed this term in accordance with the principles of claim construction as laid out by
the Federal Circuit.  The Court, therefore, rejects Juzo's contention that the claim term "flat central

26  region" is indefinite.  *See Young v. Lumenis, Inc.*, 492 F.3d 1336, 1346 (Fed. Cir. 2007) ("Claims are
considered indefinite when they are not amenable to construction . . . .  Thus, the definiteness of claim

27  terms depends on whether those terms can be given any reasonable meaning.") (internal citation
omitted).  To the extent that the Court's claim construction presents any invalidity issues, Juzo may

28  appropriately address the issue at a later stage of the proceedings.

### 3. "lateral regions disposed on opposite sides of the central region"

According to Juzo, this phrase is either indefinite or should be construed to mean "separate pieces connected to opposing sides of the flat central region." Dkt. No. 34 at 14. CircAid contends that this phrase should be construed according to its ordinary meaning. In the event that the Court decides to construe the term, CircAid avers that the term "lateral" should be interpreted as "side." Dkt. No. 33 at 11. Because the parties dispute the scope of the claim term, the Court must resolve the dispute as a matter of law. *See O2 Micro*, 521 F.3d at 1361.

Here, the parties' dispute concerns the boundary between the central region and lateral regions. Juzo argues that because the claims require that the "plurality of bands" actually "fasten onto the flat central region of the garment," one must be able to differentiate the "central region" from the "lateral region." *See* Dkt. No. 34 at 14; the '232 Patent at 16:16-17. According to Juzo, however, only the preferred embodiments depicted at FIGS. 8, 9, and 15, have discernible boundaries because they are the only garments that depict three separate piece of fabric.

FIG. 8            FIG.9            FIG. 15



*See* the '232 Patent at Sheet 5, 6, 12, Dkt. No. 35-1 at 7-8, 14. Absent three separate pieces of fabric, Juzo argues, "it is impossible to distinguish" the central from the lateral regions. Dkt. No. 34 at 15. It is, therefore, Juzo's position that the patent claims "cannot cover a unitary sheet of material" such as those depicted in FIGS. 3, 5, and 13. *Id.*

/ / / /

/ / / /

/ / / /

1

2

3

4

5



FIG. 3          FIG. 5          FIG. 13

6

7

The '232 Patent at Sheet 3, 4, 10, Dkt. No. 35-1 at 5-6, 12. Accordingly, Juzo argues,

8

either the Court should adopt its proposed construction of "separate pieces connected to

9

opposing sides of the flat central region" or find that the claim term is invalid because it

10

is indefinite. *See* Dkt. No. 34 at 17.

11

The Court begins its analysis with the claim language. The disputed term appears

12

in Claim 1 in the following context: "said garment comprising . . . a flat central region

13

having inner and outer surfaces, said central region comprising substantially inelastic

14

material, and *lateral regions disposed on opposite sides of the central region*." The '232

15

Patent at 16:8-11 (emphasis added). Notably, nothing in the claim language supports the

16

notion that the central and lateral regions must be separate pieces of fabric sewn together.

17

This fact is not surprising as Juzo readily admits that its proposed construction would

18

read out all of the preferred embodiments that are made of a unitary piece of fabric. Such

19

a move, however, is highly disfavored. "[A] claim construction that excludes [a]

20

preferred embodiment [described in the specification] is rarely, if ever, correct and would

21

require highly persuasive evidentiary support." *See Adams Respiratory*, 616 F.3d at

22

1290. The Court further notes that there is nothing ambiguous or unclear about this

23

language that justifies a departure from the plain and ordinary meaning.

24

Nonetheless, it seems to the Court that Juzo is invoking the canon to avoid

25

indefiniteness. Stated differently, the Court understands Juzo's argument to be that the

26

Court must construe the claim language in a way that reads out a number of the preferred

27

embodiments because, otherwise, the claim would be indefinite. *See* Dkt. 34 at 17. The

28

canon to avoid indefiniteness, however, is not applied as a matter of course. *See Philips*,

3:15-CV-02734-GPC-RBB

415 F.3d at 1327.  Rather, "while [the Federal Circuit] has acknowledged the maxim that claims should be construed to preserve their validity, [it] ha[s] not applied that principle broadly, and [it] ha[s] certainly not endorsed a regime in which validity analysis is a regular component of claim construction. Instead, [it] ha[s] limited the maxim to cases in which "the court concludes, after applying all the available tools of claim construction, that the claim is still ambiguous."  *Id.*; *see also Generation II Orthotics Inc. v. Med. Tech. Inc.*, 263 F.3d 1356, 1365 (Fed. Cir. 2001) (claims can only be construed to preserve their validity where the proposed claim construction is "practicable," is based on sound claim construction principles, and does not revise or ignore the explicit language of the claims). The Court, however, concludes that Juzo's proposed construction is not "practicable" as it finds no support in the claim terms, or the specification, and reads out a handful of preferred embodiments.

Because the Court is not prepared to adopt Juzo's proposed construction, it must now contend with Juzo's argument that the claim term is invalid for indefiniteness.  As stated previously, a claim is indefinite if it "fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Nautilus*, 134 S. Ct. at 2124 (emphasis omitted).  The Federal Circuit has interpreted the *Nautilus* standard to require that the claim, when read in light of the specification and prosecution history, provide objective boundaries for those skilled in the art.  *Interval Licensing*, 766 F.3d at 1371. If, however, the intrinsic record is so lacking in explanation that a skilled artisan is left "to consult the unpredictable vagaries of any one person's opinion" in order to understand the scope of the claim term, then the term is indefinite.  *Dow Chemical Co. v. Nova Chemicals Corp. (Canada)*, 803 F.3d 620, 635 (Fed. Cir. 2015).

The Court is not persuaded that Juzo has demonstrated, here, by clear and convincing evidence that the specification provides no objective boundaries between the central and lateral regions of the present invention in unitary garments.  Juzo argues that it is "impossible" to distinguish the lateral from the central regions absent a seam

between the various regions.  The Court, however, finds that there are objective boundaries for differentiating between the "lateral regions" and the "central region."

Per the claim language, the central region must be "flat," meaning "level when laid out, allowing for three-dimensionality in order to fit the body part," and it must be "substantially inelastic," meaning "largely but not wholly inelastic."  The specification further explains that the "central region" is what is wrapped "around the body part."  The '232 Patent at 6:60-61 ("The central region 10 is wrapped partially around the body part."); *id.* at 9:50-52 ("In certain embodiments, the central region 10 is wider proximally than distally to accommodate the larger circumference of proximal limb segments."); *id.* at 10:7-8 ("The garment has a central region 10 for wrapping partially around the body part.")  It is also the region that "stretches," that "provides [the] tension," and that "compresses the limb."  The '232 Patent at 6:45-48 (" . . . drawing the first and second lateral regions toward each other, which tensions the central region, and thereby tensions the central region [sic], thereby providing a tension in the garment that compresses the limb."); *id.* at 7:23-25 (". . . which stretches the central region, thereby providing a tension in the garment that compresses the limb").

By contrast, the lateral regions are not required to be "substantially inelastic," or to be "flat," and the specification never describes the lateral regions as providing "tension" or performing the "compression."  Instead, the specification describes the "lateral regions" as those regions that are drawn "toward each other" when wrapping the garment around a body part.  *See* the '232 Patent at 3:54-56 ("In use, the user encircles the limb. . . and draws the first lateral region toward the second longitudinal edge to stretch the central region and thereby provide a tension in the garment that will compress the limb"); *id.* at 6:44-46 (". . . [the bands are secured] drawing the first and second lateral regions toward each other, which tensions the central region").  Accordingly, the Court finds that a person of ordinary skill in the art could distinguish between the lateral and central regions, even in one-piece garments, given these objective boundaries.

In sum, the Court concludes that the claim term does not introduce the "zone of uncertainty" prohibited by the *Nautilus* standard.  Although one-piece garments of the present invention do not contain a seam between the central and lateral regions, the Court finds that a person skilled in the art would be able to differentiate between the two regions given the specification's description of the "central region" as flat, substantially inelastic, and as the region supplying the tension and compression in the garment.  Thus, the Court concludes that the claim is not invalid for indefiniteness as Juzo has not shown by clear and convincing evidence that there is a "zone of uncertainty" impossible to discern between the two regions.  *See Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001) (a court should not hold a claim invalid if the meaning is discernible "even though the task may be formidable and the conclusion may be one over which reasonable persons disagree.")  Accordingly, the Court sides with CircAid and concludes that the term "lateral regions disposed on opposite sides of the central region," should bear its plain and ordinary meaning.  The Court, therefore, construes the term as "the regions located at either side of the central region."

### 4. "a plurality of bands extending from lateral margins disposed at opposite side edges of said opposite lateral regions wherein the bands extending from the opposite lateral regions are juxtaposed to pass between one another"

The construction proposed by Juzo interprets this passage to mean "at least two bands on each side of the garment positioned such that at least one band on each side passes immediately between two bands on the opposite side."  Dkt. No. 34 at 17. CircAid, by contrast, contends that the passage should be given its plain meaning or, in the alternative, that "juxtaposed" should be construed as "close together or side by side." Dkt. No. 33 at 14.  Because the parties' dispute concerns claim scope, the Court must resolve it as a matter of law.  *See O2 Micro*, 521 F.3d at 1361.

The disagreement between Juzo and CircAid, here, concerns whether this phrase can include garments with three bands, where there are two bands on one side of the garment and one on the other.  *See* Dkt. No. 34 at 17-18.  Juzo argues that the claim

language itself requires that there be at least two bands on each side of the compression garment and that at least two bands, one on each side, pass between another set of two bands. *Id.* CircAid counters by noting that Juzo's proposed construction is unnecessarily limiting because it reads "a plurality of bands" as being required for each side of the garment rather than for the garment as a whole. Dkt. No. 36 at 9.  Accordingly, CircAid argues that the plain and ordinary meaning of the claim term encompasses a garment with three bands: "two extending from one lateral margin and one from the other." *Id.* For the reasons that follow, the Court sides with CircAid and concludes that the claim language is broad enough to include a garment with two bands on one side, and one on the other.

The Court begins with the disputed claim language.

**b.** a *plurality of bands* extending from lateral margins disposed at opposite edges of said opposite lateral regions, wherein *the bands* extending from the opposite lateral regions *are juxtaposed to pass between one another* and fasten onto the flat central region of the garment.

The '232 Patent at 16:12-17 (emphasis added).  The Court starts by noting that this language does not require that the garment have more than three bands. The Court further notes that the claim language describes the "plurality of bands" in reference to the garment as a whole, (e.g. "from lateral margins," "at opposite edges of said opposite lateral regions," "extending from opposite lateral regions"), rather than in reference to any specific region of the garment, thus cutting against the argument that there must be a "plurality of bands" extending from each lateral margin. Finally, the Court observes that the term "one another" is a reciprocal term explaining that the positioning of the bands should be understood in a relational manner, and not in reference to a discrete number of bands.

Nevertheless, Juzo argues that the claim language lends support to its argument.  In fact, it contends that the claim's description of the "plurality of bands" specifies the "position" and "location" of the bands because the language requires that the "plurality of bands" actually "pass between one another."  Dkt.

No. 34 at 17.  Thus, Juzo argues, because only those bands that have a band physically flanking it from above and below actually "pass between," its proposed construction is correct.  *Id.*  The Court, however, disagrees that the plain and ordinary meaning of a plurality of bands juxtaposed to pass between one another is so limiting.

The first half of the disputed claim term introduces the concept of "a plurality of bands" and explains that they extend from the opposite lateral margins. *See* the '232 Patent at 16:12.  The second half of the claim term limits the plurality of bands by explaining that they must be positioned so as to be "juxtaposed to pass between another."  In other words, all of the bands contained within the "plurality of bands" must be "juxtaposed to pass between one another," and no one band is omitted from that limitation.

Turning to the specification, a person skilled in the art would see examples of garments with a "plurality of bands" and examples of how they are "juxtaposed to pass between one another."  Take FIG. 1 for instance.



The '232 Patent at Sheet 1, Dkt. No. 35-1 at 2.  FIG. 1 has eight bands, together constituting a "plurality of bands."  Yet of the eight bands present on the garment, only six can ever physically pass through two other bands, because the top and bottom bands represent the top and bottom boundaries of the garment.  Juzo proposes that this fact (i.e., the fact that a top and bottom band will never physically pass two other bands) means that only the six inner bands are

"juxtaposed to pass between one another" and only those six bands comprise a "plurality of bands." This conclusion, however, makes little sense. The claim language does not state that only the inner bands are juxtaposed to pass between one another. Likewise, the claim also does not state that the "plurality of bands" referenced in the first half of the term only include the inner bands of a garment. In fact, the claim language does not differentiate between the garment's bands at all (i.e., by indicating that some comprise "a plurality of bands" while the others are omitted from the definition because they cannot be "juxtaposed to pass between one another.") Accordingly, a person skilled in the art would understand the phrase "juxtaposed to pass between one another" to describe all the bands of any given garment, including the top and bottom bands that create an interval or space through which just one other band can pass.

Despite what Juzo argues, any other conclusion would be untenable because it would mean that the term "plurality of bands" does not refer to all of the bands in any given garment. Such a construction is not supported by the claim language, which speaks of the garment's bands only in terms of a "plurality of bands," and the specification, which does not speak of any bands that are not included within the "plurality of bands." As such, the Court sees no reason to conclude that the plain and ordinary meaning of the disputed term precludes a garment with only three bands, two on one side, and one on the other. Contrary to what Juzo argues, the juxtaposition of three bands would create a space sufficient for the bands to pass between one another.

In reaching this conclusion, the Court also rejects Juzo's other arguments in support of its proposed construction. For one, the Court declines to import limitations from the preferred embodiments into the claim term. Thus, just because none of the preferred embodiments depict a garment with less than four bands does not mean that there must be at least two bands on each side of the garment. *See Douglas Dynamics*, 717 F.3d at 1342 (a "claim construction must not import limitations from the

specification into the claims.")  Two, the Court is also not persuaded by Juzo's argument

that the patentee's description of the claim term evinced an intent to require at least two

bands on each side of the garment.  Juzo notes that CircAid added the language

"juxtaposed to pass between one another" in order to overcome a prior art rejection.  Dkt.

No. 34 at 18.  CircAid explained the addition as follows:

> This feature of the invention is described in the specification at pages 5 and
> 11 and is clearly seen in Fig. 1 . . .

> FIG. 1[8]



> where bands 20, 22, 24 and 26 are juxtaposed with bands 21, 23, 25 and 27
> such that band 20 passes between bands 21 and 23; band 23 passes between
> bands 20 and 22; band 22 passes between bands 23 and 25, etc. when the
> device is wrapped around the patient's limb.

*Id.* (emphasis omitted).  Because this explanation does not describe the top band, 21, or

the bottom band, 26, as passing between another band, Juzo argues that there cannot be a

"plurality of bands juxtaposed to pass between one another" when only one band, situated

on one side of the device, passes through two bands, on the opposite side.  *Id.* at 18-19.

    Yet as the Court concluded above, the claim language "juxtaposed to pass between

one another" does not attach only to the inner bands, but rather, it necessarily modifies

the plurality of bands, which includes top and bottom bands.  Adopting Juzo's

construction would omit the top and bottom bands from the "plurality of bands" disclosed

in the garment, which would render the claim language and patent confusing and

---

[8] This labeled reproduction of FIG. 1 appears in Juzo's Claim Construction Brief.  Dkt. No. 34 at 19.

incomplete. Moreover, the plain language of the claim term does not require that more than one band pass between two other bands. Instead, it refers to the bands as an entity and describes all of them as passing between one another; and this language, as stated previously, is broad enough to include a garment that has two bands on one side and one on the other.

Accordingly, the Court agrees with CircAid and adopts the plain and ordinary meaning of the claim term. Thus, it construes "a plurality of bands extending from lateral margins disposed at opposite side edges of said opposite lateral regions, wherein the bands extending from the opposite lateral regions are juxtaposed to pass between one another" as "a plurality of bands extending from lateral margins disposed at opposite side edges of said opposite lateral regions, wherein the bands extending from the opposite lateral regions are juxtaposed to allow at least one band to pass through two others on the opposite side."

**5. "one or both edges comprise a curve or indentation"**

Juzo avers that "one or both edges comprise a curve" should be construed as "at least one of the edges is curved throughout its length," Dkt. No. 34 at 19, and that "one or both edges comprise a[n]. . . indentation" should be construed as "at least one of the edges has a recess formed into the edge of a band that mates (engages) with a recess in another band," *id.* at 22. In contrast, CircAid argues that both terms should be given their plain meaning and that, if necessary, comprise should be construed as "includes." Dkt. No. 33 at 16. Because the parties present differing constructions of the claim's scope, the Court must decide the dispute as a matter of law. *See O2 Micro*, 521 F.3d at 1361.

**5a. "One or both edges comprise a curve"**

Here, the dispute over claim scope consists of whether the phrase "one or both edges comprise a curve" can include an "edge that transitions from the top or bottom edge to a side edge." Dkt. No. 34 at 19. Juzo argues that this claim term does not encompass a curve that is a transition from one edge to another for two reasons: (1) the specification limits the term to only "edges curved throughout their length" and (2) the

patentee disavowed a transitional curve in the prosecution history.  *See* Dkt. No. 34 at 19-21.  For the following reasons, the Court rejects both contentions and concludes that the claim language is broad enough to include a curve that transitions from one edge to a side edge.

Claim 1 states that "each of said [plurality of] bands" comprises "proximal and distal edges, wherein one or both edges comprise a curve or indentation."  The '232 Patent at 16:19-20.  As written, this term is not ambiguous.  Moreover, the claim term is not given any special definition or meaning by the claim language.  The Court also notes that the claim language does not require that the edge include a curve throughout its length or state that transitional edges are omitted from the claim term.

As for Juzo's contention that the term "one or both edges comprise a curve" must mean "at least one edge is curved throughout its length," the Court finds that there is no support for this construction in the intrinsic record.  Put simply, Juzo's proposed construction is unnecessarily limiting.  For one, Juzo's proposed construction improperly imports a limitation from the preferred embodiments into the claim term.  Juzo argues that because FIGS. 1, 3, 5, 9, 10, and 13 all have edges that are curved throughout their length, the term "one or both edges comprise a curve" must mean "at least one of the edges is curved throughout its length."  Dkt. No. 34 at 21.  It is, however, "improper to read limitations from a preferred embodiment described in the specification . . . into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited."  *Dealertrack, Inc.*, 674 F.3d at 1327 (citations omitted); *see also Douglas Dynamics*, 717 F.3d at 1342 (a "claim construction must not import limitations from the specification into the claims.")  Thus, because there is no clear indication in the written description that curves must run "throughout the length" of the band edges, as opposed to somewhere or anywhere on the band, the Court rejects this argument.

Two, the Court also rejects Juzo's attempt to limit the term "one of both edges comprise a curve" by arguing that the alleged purpose of having edges with curves is limiting.  Juzo contends that, according to the specification, the "curves" in the band

edges accomplish one of two purposes: (1) "avoid[ing] gaps between spaced apart bands by widening the band toward the middle so that no gap occurs due to "necking" or (2) "enabl[ing] the bands to pass between one another when they are not offset." Dkt. No. 34 at 21. Thus, Juzo contends, because its proposed construction accomplishes the dual purpose of preventing necking and overlap, its proposed construction is the correct one. *Id.*

"Claim construction," however, "is a function of the words of the claim not the 'purpose' of the invention." *See Source Vagabond Systems Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1301 (Fed. Cir. 2014). Here, the term "one or both edges comprise a curve" does not mean a curve to prevent necking, or to prevent overlap, because nothing in the claim language modifies or restricts the word "curve" in any way. *See York Products*, 99 F.3d at 1573 (concluding that it was incorrect to tie the meaning of a claim term to the function of the invention absent a clear indication that the purpose was limiting). There is also no clear indication that the specification's description of "necking" and "overlapping" must be read as a limitation on the claim term "one or both edges comprise a curve." The specification's description of "necking" and "overlap" is stated in permissive, not mandatory, terms. *See, e.g.*, the '232 Patent at 7:36-38 ("The width 36 of a band *can* be sized to account for the reduced surface caused by necking that can occur when using an elastic material for the bands") (emphasis added); *id.* at 7:41-43 ("*For example*, if the distal and/or proximal edges of overlapping bands are curved outward to compensate for necking . . . " (emphasis added); *id.* at 9:64-66 ("The bands *can also have* varying widths 36, as can the length of the bands to accommodate any necking that occurs") (emphasis added). The patentee, therefore, is entitled to the full scope of the plain and ordinary meaning of "one or both edges comprise a curve." *See Home Diagnostics*, 381 F.3d at 1357 ("a patentee may claim an invention broadly and expect enforcement of the full scope of that language absent a clear disavowal or contrary definition in the specification.")

The Court further concludes that an "edge that transitions from the top or bottom edge to a side edge" is included within the claim scope. Juzo's contention that the expression "one or both edges comprise a curve" cannot include an "edge that transitions from the top or bottom edge to a side edge" is contradicted by the preferred embodiment depicted at FIG. 12, which discloses an edge that only has a curve that transitions from the top and bottom edges to the side edges and interior of the garment. *See* the '232 Patent at Sheet 9, Dkt. No. 35-1 at 11. "[A] claim construction that excludes [a] preferred embodiment [described in the specification] is rarely, if ever, correct and would require highly persuasive evidentiary support." *Adams Respiratory*, 616 F.3d at 1290.

Juzo, however, has not presented such highly persuasive evidentiary support, here. Notwithstanding its protestations to the contrary, the prosecution history does not amount to a clear disavowal of "an edge that transitions from the top or bottom edge to a side edge" from the claim's scope. Juzo essentially argues that the scope of "one or both edges comprises a curve" cannot include a curved transition because one of the figures depicted in prior art — namely, FIG. 15 of U.S. Patent No. 6,338,723 ("the '723 patent") — disclosed the exact same "curved transition" that CircAid seeks to include in the claim's scope. *See* Dkt. No. 34 at 21.

FIG. 15



Carpenter Figure 15, Dkt. No. 34 at 21; *see also* U.S. Patent No. 6,338,723 ("the '723 patent"), Exhibit E, Dkt. No. 35-5 at 12. The issue, however, with Juzo's reasoning is

3:15-CV-02734-GPC-RBB

that the prosecution history did not clearly distinguish the present invention from FIG. 15 on the basis of the disputed curved transitions, but on the basis of another claim feature – namely, the "planar distal region."[9]   As CircAid points out, the patentee distinguished the present invention from FIG. 15 by (1) noting that FIG. 15 lacked *both* "edges comprising a curve" *and* bands with "planar distal regions," and (2) by observing that FIG.15 clearly lacked planar distal regions.  Accordingly, because the '232 applicant overcame the prior art depicted at FIG. 15 by demonstrating that the prior art did not contain the limitation of "planar distal regions," Juzo's argument fails because the prosecution history is inconclusive as to whether FIG. 15 also lacked "one or both edges compris[ing] a curve."

In sum, the Court sides with CircAid and concludes that the term "one or both edges comprise a curve" should be construed in accordance with its plain and ordinary meaning.  The Court further concludes that this claim term can include an "edge that

_____

[9] Carpenter Figure 15 is mentioned twice in the prosecution history. The first reference reads as follows:
> Carpenter Figures 15, 18, 21, and 40 disclose bands in which slots 45 (depicted above) or orifices are formed in the distal region of a plurality of bands.  New claim 15 limits the distal region to one that is *planar*, that is to say, having a surface without voids, orifices, or slots formed therethrough.

Exhibit D, Dkt. No. 35-4 at 5.  This paragraph makes clear that the '232 patent distinguished itself from Figure 15 by virtue of the fact that the present invention has planar bands, meaning, bands without voids, orifices, or slots.  *See* the '232 patent at 16:17-18 ("each of said bands comprising (i.) a planar distal region").  The second reference to Figure 15 goes on to note that:

> None of the garments disclosed in Carpenter's Figures 15, 16, 18, 21, and 40 contain limitations to bands in which the distal regions of bands are *both* planar *and* comprise curved edges.  Since <u>all</u> of the limitations in new claim 15 are found in <u>none</u> of the Carpenter reference figures, the present invention, as newly claimed, avoids anticipation by the figures disclosed in Carpenter.

Exhibit D, Dkt. No. 35-4 at 6 (italics in original) (underlines added).  Accordingly, the '232 applicant distinguished its invention from Figure 15 not on the basis that Figure 15 did not have an edge comprising a curve, but because it did not have an "edge comprising a curve" plus planar bands.  Thus, because the '232 applicant overcame the prior art depicted at Figure 15 by demonstrating that the prior art did not contain "planar distal regions," Juzo's argument fails because its reasoning depends upon Figure 15 being clearly differentiated as having "edges that comprise a curve."

transitions from the top or bottom edge to a side edge."  Accordingly, the Court construes "one or both edges comprise a curve" as "one or both edges includes a curve at any point along, or at either terminal end, of the edge."  *See CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007) ("In the patent claim context the term "comprising" is well understood to mean "including but not limited to" and also noting that the term "comprising" embraces "comprises").

**5b. "one or both edges comprise a[n] . . . indentation"**

The relevant dispute, here, is whether this term can include "notches that extend into the main body of the garment."  Dkt. No. 34 at 22.  Juzo argues that such notches cannot be contained within the claim scope because the term "indentation," when read in light of the specification, requires that the term be limited by the disclosed purpose of having "indentations" in the band edges.  *See* Dkt. No. 34 at 22-23.  CircAid, by contrast, argues that "indentation" has no special meaning and thus should be given the scope of its plain and ordinary meaning.  For the reasons that follow, the Court agrees with CircAid and concludes that the scope of the claim includes "notches" that occur anywhere along the edge, including into the body of the garment.

The Court begins with the claim itself.  Claim 1 states that "each of said [plurality of] bands" comprises "proximal and distal edges, wherein one or both edges comprise a[n] . . . indentation."  The '232 Patent at 16:17, 19-20.  The parties concede that the claim language does not provide the term "indentation" with any special meaning.  *See* Dkt. No. 33 at 16; Dkt. No. 34 at 22.  The parties also do not dispute that the specification does not use the word "indentation."  *See* Dkt. No. 33 at 16; Dkt. No. 34 at 22.

Notwithstanding the fact that the word "indentation" does not appear in the specification, Juzo argues that the "recesses," which are described throughout the specification, must refer to the disclosed "indentation."  Dkt. No. 34 at 22.  Juzo notes that a synonym for indentation, "recesses," appears in reference to FIGS. 3 & 8 of the '232 patent.  Dkt. No. 34 at 23.

/ / / /

32

1

FIG. 3                                FIG.8

2

3

4

5




6

7

8

9   The '232 Patent, Sheet 3 & 5, Dkt. No. 35-1 at 5-7.  The specification, Juzo emphasizes,

10  describes both figures as having "recesses" that "form[ ] in either the proximal or distal

11  edges of the bands to facilitate wrapping engagement by juxtaposition of the proximal

12  and distal recessional edges of opposing bands."  *Id.* at 4:4-7.  Thus, Juzo argues, because

13  the purpose of those recesses is to "accommodate interlocking with an opposing band's

14  recess to allow the bands to overlap without bunching," that meaning should be read into

15  the claim term.  Dkt. No. 34 at 22-23.

16         The Court, however, is not persuaded by Juzo's argument.  Even if it is correct to

17  equate the "recesses" described in FIG. 3 & 8 with the claimed "indentations," there is no

18  clear indication in the specification that the patentee intended for any purpose attributed

19  to those "recesses" to be limiting.  *See, e.g.*, the '232 Patent at 7:45-50 ("Referring to

20  FIG. 3, the bands *may* include areas of reduced width 31 created by a recess formed into

21  a proximal 35 or distal edge 40 of the band.") (emphasis added); *id.* at 10:61-62; *id.* at

22  11:7-15 ("FIG. 8 has . . . bands [with] a region of reduced width 205 formed by recesses

23  37 in a proximal and distal edge of the band"); *id.* at 4:4-7 ("*Still other embodiments*

24  provide bands in which recesses are formed in either the proximal or distal edges of the

25  bands.") (emphasis added).  The claim language does not state "wherein one or both

26  edges comprise a[n] . . . indentation to facilitate wrapping engagement."  *See York*

27  *Products*, 99 F.3d at 1573 (reasoning that if "substantial height" only meant "ample

28  height to accomplish a purpose, the claim would need to read [as] 'only so much height

33

as necessary to affix a structure against movement.'")  Accordingly, because there is no such limitation following the claim term "indentation," the Court will not read in such a limitation.  *See Source Vagabond*, 753 F.3d at 1301 ("Claim construction is a function of the words of the claim not the 'purpose' of the invention."); *see also Douglas Dynamics*, 717 F.3d at 1342 ("a claim construction must not import limitations from the specification in the claims."); *Home Diagnostics*, 381 F.3d at 1357 ("a patentee may claim an invention broadly and expect enforcement of the full scope of that language absent a clear disavowal or contrary definition in the specification.").

The Court is also not convinced that the prosecution history supports Juzo's proposed construction.  Juzo's argument, in this respect, is a recapitulation of the argument it made as to the claim term "one or both edges comprise a curve," discussed *supra*.  In short, it contends that because the '232 applicant added the "curve or indentation" limitation in order to overcome the '723 prior art, the word "indentation" must be narrowed in order to not include the patent that was overcome.  Dkt. No. 34 at 22.  As such, Juzo concludes that because FIG. 15 of the '723 patent has indentations that extend into the body of the garment, the word "indentation" in the claim term cannot be read to have that meaning.

The Court rejects this argument for the same reason it rejected the argument when made to support Juzo's proposed construction of "one or both edges comprise a curve." The prosecution history of the present invention did not distinguish itself from FIG. 15 of the prior art by stating that the present invention had "indentations" while FIG. 15 did not, but by stating that FIG. 15 did not have "planar bands" and an "edge comprising a curve or indentation," while the present invention had both.  Accordingly, because the '232 patent applicant overcame the prior art by demonstrating that the present invention had a combination of qualities that the prior art did not, Juzo's argument fails.

Finally, the Court also rejects Juzo's argument that the term "one or both edges comprise a[n] . . . indentation" cannot include a notch that extends into the body of the garment.  For one, because the Court rejects Juzo's argument that the prosecution history

supports its claim construction, Juzo's position that the claim term cannot include notches that extend into the body of the garment finds no support in the intrinsic record.  Two, Juzo has offered no persuasive reason as to why the claimed indentation cannot occur at the end of the edge, where it meets the body of the garment.  Indeed, the plain and ordinary meaning of "one or both edges comprise a[n] . . . indentation" would suggests that the indentation can be included at any point along the length of the edge, and does not have to somehow be "within the edge."

To conclude, the Court agrees with CircAid that the claim term "one or both edges comprise a[n] . . . indentation" should be construed in accordance with its plain and ordinary meaning.  Accordingly the Court construes "one or both edges comprise a[n] . . . indentation" as "one or both edges includes an indentation occurring at any point along, or at either terminal end, of the edge."  *See CIAS*, 504 F.3d at 1360 (stating that "the term 'comprising' is well understood to mean 'including but not limited to'" and also noting that the term "comprising" embraces "comprises").

### 6. "proximal and distal edges"

Claim 1 states that "each of said [plurality of] bands" includes "proximal and distal edges."  The '232 Patent at 16:19.  Juzo readily admits that the plain and ordinary meaning of "proximal and distal edges" is "top and bottom edges."  Dkt. No. 34 at 19 ("The parties agree that the phrase 'proximal and distal edges' of a band generally refer to the top and bottom edges of a band.")  Notwithstanding this concession, Juzo nonetheless argues that "proximal and distal edges" should be construed as "the top and bottom edges of the band extending from the lateral margin and excluding the transition from top edge or bottom edge to side edge" because the prosecution history indicates that "proximal or distal edges comprising a curve" cannot include a curved edge that transitions from the top or bottom edge to a side edge.  *Id.* at 19-20.  Yet, as stated above *supra* Section 5a, the Court rejects Juzo's argument that the prosecution history was "crystal clear" in exempting a curved transitional edge from the scope of the claim term "one or both edges comprise a curve."  Accordingly, the Court similarly rejects Juzo's

1   attempt to use the prosecution history, here, as a means to jettison transitional edges from

2   the scope of the term "proximal and distal edges."

3          Accordingly, the Court adopts the plain and ordinary meaning of "proximal and

4   distal edges" and construes the term as "top and bottom edges."

5   **7.   "the central and lateral regions are biased into a three-dimensional**
       **curvature"**

6

7          Juzo avers that this phrase should be construed to mean "a three-dimensional

8   curvature is formed at intersections of the central region and lateral regions."  Dkt. No. 34

9   at 23.  CircAid once again argues that no construction is necessary.  Dkt. No. 33 at 17.

10  Because the parties dispute the claim scope of this term, the Court must resolve the

11  disagreement as a matter of law.  *See O2 Micro*, 521 F.3d at 1361.

12         Turning first to the claim language, this phrase appears in dependent Claim 2, as

13  follows: "The garment according to claim 1 wherein the central and lateral regions are

14  biased into a three-dimensional curvature in order to fit the body part."  The '232 patent

15  at 16:28-30.  The Court notes that nothing in the language itself requires that the three-

16  dimensionality must form at the intersection of the central and lateral regions.  The Court

17  also observes that there is no clear indication in the specification that the three-

18  dimensionality must form at the intersection of the two regions.  *See, e.g.*, the '232 patent

19  at 4:56-58 ("Preferred embodiments of the garment involve the central and lateral regions

20  which are biased into a three-dimensional curvature in order to fit the body part.")

21  Turning to the specification, the Court further concludes that it is improper to rely on

22  FIGS. 8, 9, and 15, all of which contain a three-dimensional curvature at the intersection

23  of the central and lateral regions, as a limitation on the claim's scope.  *See Douglas*

24  *Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1342 (Fed. Cir. 2013) (A "claim

25  construction must not import limitations from the specification into the claims.")

26         Notwithstanding the lack of support in the intrinsic record for any departure from

27  the plain and ordinary meaning of the claim term, Juzo contends that its proposed

28  construction is the correct one because only its interpretation makes clear that the "central

36

region alone" cannot be biased into a three-dimensional curvature.  Dkt. No. 33 at 23.
This is so, Juzo argues, because any construction of the term "the central and lateral
regions are biased into a three-dimensional curvature" that allows the central region by
itself to be biased contradicts the claim requirement that the central region be flat.  *Id.*  In
other words, Juzo is arguing that the interrelationship between its proposed construction
of "flat central region" in independent claim 1, necessitates that the Court adopt its
proposed construction of "the central and lateral regions are biased into a three-
dimensional curvature" in dependent claim 2.

The Court, however, has rejected Juzo's proposed construction of "flat central
region."  As stated above, *supra* Section 2, the Court disagrees that the plain and ordinary
meaning of "flat," read in light of the intrinsic record, means "level or even without
raised areas or indentations when laid out."  Instead, the Court finds that the term "flat" is
broad enough to include some three-dimensionality and should be construed as "level
when laid out, allowing for three-dimensionality in order to fit the body part."  As such,
the Court is not persuaded by any argument, like Juzo's here, that relies on a proposed
construction that the Court has rejected.  The Court has determined that the plain and
ordinary meaning of "flat central region" allows for some three-dimensionality in order to
fit the body part.  Accordingly and contrary to what Juzo contends, there is no inherent
conflict between independent claim 1 and dependent claim 2 that requires a limiting
interpretation of "the central and lateral regions are biased into a three-dimensional
curvature."

In sum, the Court concludes that the intrinsic record does not support any departure
from the plain and ordinary meaning of "the central and lateral regions are biased into a
three-dimensional curvature."  The patentee is entitled to the full scope of the plain and
ordinary meaning of the words used in the claim, as understood in light of the intrinsic
record by a person of ordinary skill in the art.  *See Home Diagnostics*, 381 F.3d at 1357
("a patentee may claim an invention broadly and expect enforcement of the full scope of
that language absent a clear disavowal or contrary definition in the specification.")  The

1  Court, therefore, construes the term as "the central and side regions are formed into a
2  three-dimensional curvature."

3     8. "substantially perpendicular"

4     With regards to the term "substantially perpendicular," Juzo contends that the term
5  is indefinite or, in the alternative, that the Court should construe it to mean "essentially
6  90 degrees *within manufacturing tolerances*."[10]  Dkt. No. 34 at 24.  CircAid maintains
7  that no construction is necessary because the words used have a plain and ordinary
8  meaning.  Because the parties dispute the claim's scope, the Court's must resolve the
9  matter as a question of law.  *See O2 Micro*, 521 F.3d at 1361.

10    Here, the dispute concerns whether or not the term "substantially perpendicular"
11  can cover any band angle or, put differently, whether a band angle can be both
12  "substantially perpendicular" and "non-normal" at the same time.  *See* Dkt. No. 34 at 25.
13  For the following reasons, the Court agrees with Juzo insofar as it contends that the scope
14  of the term "substantially perpendicular," when read in light of the intrinsic record,
15  cannot mean "non-normal."  The Court disagrees, however, that it is necessary to adopt
16  Juzo's proposed construction in order to give the claim its plain and ordinary meaning.

17    Beginning with the claim language, the Court observes that the term "substantially
18  perpendicular" first appears in Claim 3, "[t]he garment of claim 2 wherein said opposing
19  bands extend *substantially perpendicular* to a longitudinal axis of said central region, and
20  said proximal and distal edges are substantially parallel to each other."  The '232 Patent
21  at 16:31-34 (emphasis added).  The term appears again in Claim 6: "the garment of claim
22  5 wherein at least one set of opposing bands extends *substantially perpendicular* to a
23  longitudinal axis of said central region, and said proximal and distal edges are

---

[10] At oral argument, Juzo abandoned its defense of the words "within manufacturing tolerances," located at the end of its proposed construction. Transcript of Oral Argument, Dkt. No. 43 at 55:5-8 ("frankly, it ["within manufacturing tolerances"] probably should have been deleted before we submitted the final proposal to the Court.  I think we would be happy saying "substantially perpendicular" means essentially 90 degrees.")  As such, the Court will treat Juzo's proposed construction as arguing for "essentially 90 degrees."

1    substantially parallel to each other; and at least one set of opposing bands extends at a
2    non-normal angle to the longitudinal axis of the central region . . . . " *Id.* at 16:44-50
3    (emphasis added).  The claim language does not indicate that the word "substantially
4    perpendicular" has any special meaning in the art.  The claim language does, however,
5    contrast bands that extend "substantially perpendicular" from bands that extend "at a non-
6    normal angle."  *See id.*  That the term "substantially perpendicular" is contrasted with
7    "non-normal angle" evidences an intent to define these two terms as mutually exclusive.

8          The specification supports construing the two terms as mutually exclusive.  *See id.*
9    at 3:60-66 ("Various embodiments are provided in which the opposing bands extend
10   *either* substantially perpendicular to a longitudinal axis of the central region . . . *or* the
11   bands extend from a lateral region *at an angle* with respect to a longitudinal axis of the
12   central region.") (emphasis added); *id.* at 6:29-32 ("a device may comprise sets of
13   opposing bands which all extend perpendicularly from the longitudinal axis, or all extend
14   at non-normal angles; or any combination of normal and non-normal angles.")  As such,
15   the Court concludes that an angle cannot be both "substantially perpendicular" and "non-
16   normal."

17         That the Court finds "substantially perpendicular" and "non-normal" to be
18   mutually exclusive terms, however, does not necessitate that the Court adopt Juzo's
19   proposed construction.  Juzo's proposed construction does not argue for a departure from
20   the plain and ordinary meaning of "substantially perpendicular," but instead argues that
21   "the claim language affirms the ordinary meaning of 'substantially perpendicular' to be
22   'essentially 90 degrees.'"  Dkt. No. 34 at 25.  It is unclear, however, how "essentially 90
23   degrees" gives the term greater clarity than does "substantially perpendicular."  Thus,
24   because Juzo's proposed construction does not "define[ ] the claim with greater precision
25   than had the patentee," *see Pall Corp. v. Hemasure Inc.*, 181 F.3d 1305, 1308 (Fed. Cir.
26   1999), and because it does not offer any intrinsic evidence otherwise justifying a
27   departure from the plain and ordinary meaning, *see, e.g.*, *Source Vagabond*, 753 F.3d at
28   1299-01, the Court will not adopt Juzo's proposed construction.

1    To conclude, the Court agrees with Juzo insofar as it argues that an angle that
2  extends "substantially perpendicular" cannot also be a "non-normal angle," but declines
3  to adopt Juzo's proposed construction of "essentially 90 degrees" because it
4  unnecessarily rewrites the claim term where there is no dispute that the plain and ordinary
5  meaning of "substantially perpendicular" applies.  Furthermore, the Court rejects Juzo's
6  hasty argument that this claim term is indefinite.  As the Court stated above with regard
7  to its construction of the term "substantially inelastic material," the term "substantial" is a
8  "meaningful modifier implying 'approximate,' rather than 'perfect.'"  *Liquid Dynamics,*
9  *Inc.*, 355 F.3d at 1368.  Because this claim term is amenable to a reasonable construction,
10  the Court rejects Juzo's contention that the term is indefinite.  *See Young v. Lumenis, Inc.*,
11  492 F.3d 1336, 1346 (Fed. Cir. 2007) ("Claims are considered indefinite when they are
12  not amenable to construction . . . .  Thus, the definiteness of claim terms depends on
13  whether those terms can be given any reasonable meaning.") (internal citation omitted).

14    The Court, therefore, construes the term "substantially perpendicular" as "at an
15  angle that is largely but not wholly perpendicular, and not a non-normal angle."  In
16  context, the term reads as follows in Claim 4 and 6: "opposing bands extend *at an angle*
17  *that is largely but not wholly perpendicular, and not a non-normal angle,* to a
18  longitudinal axis . . . ."

19   **9. "Said angle is independently selected for each band"**
20    With respect to this claim term, Juzo contends that it should be construed to mean
21  "each of said bands has an angle that is selected during design without consideration of
22  the angle of any other band."  Dkt. No. 34 at 26.  CircAid disagrees and argues that the
23  term should be given its plain and ordinary meaning.  Dkt. No. 33 at 18.  Because the
24  parties dispute claim scope, the Court must resolve the disagreement as a matter of law.
25  *02 Micro*, 521 F.3d at 1361.

26    The relevant dispute, here, concerns the meaning of "independently selected" and
27  the relationship between the band angles.  Juzo argues that the phrase "independently
28  selected" should be taken to mean that the angles of the bands do not rely on one another.

*See* Transcript of Oral Argument, Dkt. No. 43 at 60:10-12.  CircAid, in turn, argues that the phrase does not need to be construed because the intrinsic record confirms that this phrase simply means "angles extend independently of each other" and, thus, the plain and ordinary meaning is sufficient.  Dkt. No. 33 at 18.  For the reasons that follow, the Court rejects CircAid's position that no construction is necessary, rejects Juzo's proposed construction, and instead construes the term according to its plain and ordinary meaning as understood by skilled artisan in light of the intrinsic record.  *See 02 Micro*, 521 F.3d at 1360 ("Words of a claim are generally given their ordinary and customary meaning, which is the meaning a term would have to a person of ordinary skill in the art after reviewing the intrinsic record at the time of the invention.")

To that end, the Court begins by analyzing the claim language itself.  The phrase "said angle is independently selected for each band" appears once in the claim language, specifically, at Claim 5:

> The Garment of claim 1 wherein each of said bands extend from a lateral region at an angle with respect to a longitudinal axis of the central region, *and said angle is independently selected for each band*.

The '232 Patent at 16:40-43 (emphasis added).  As an initial matter, the Court finds the disputed language, when read in isolation, to be ambiguous.  As is evidenced by the dispute between the parties, the challenged language raises questions about how a band is "independently selected" and when it is "independently selected."  *See* Transcript of Oral Argument at 57:21-58:4.

A court, however, does not read a disputed term in isolation, but rather, in the context in which it appears in the claim and in the context of the entire patent, including the specification.  *See Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998).  In this way, the Court can begin to ascribe some meaning to the disputed term by analyzing the relationship between Claim 5 and the other claims.

Claim 1, upon which Claim 5 is dependent, says nothing of band angles.  *See generally id.* at 16:6-27.  As such, there is a presumption that Claim 5 adds a limitation to

the band angles, that is, a limitation that is not present in Claim 1.  *See Phillips*, 415 F.3d at 1315.  The first half of Claim 5 explains that the bands extend *at an angle* with respect to the x-axis of the central region.  A person skilled in the art would understand "at an angle" to refer to an angle that is not "substantially perpendicular."  This is so because both Claims 3 and 6 specifically describe bands that extend "substantially perpendicular" and Claim 6 specifically contrasts angles that are "substantially perpendicular" with angles that are "non-normal."  *See* the '232 Patent at 16:32-34; *id.* at 16:44-51.  Indeed, the specification further reinforces this conclusion, that is, that it is correct to distinguish between bands that extend "at an angle" from those that extend "substantially perpendicular."  *See* the '232 Patent at 4:60-65 ("Various embodiments are provided in which the opposing bands extend *either substantially perpendicular* to a longitudinal axis of the central region . . . *or* the bands extend from a lateral region *at an angle* with respect to a longitudinal axis of the central region, or combinations therefore.")  Moreover, such a conclusion syncs with the Court's interpretation of "substantially perpendicular," discussed *supra* Section 8.

Although the specification (arguably) does not depict a garment with a plurality of bands "wherein *each of* said bands extend from a lateral region *at an angle* with respect to a longitudinal axis," the specification contains many examples of how bands may extend "at an angle."  The preferred embodiments that include ~~a plurality of~~ bands extending at an angle, as to the central axis of the garment, are FIGS. 1, 3, 5,  9, 10, and 13.  The band angles of those six garments can be contrasted with the garments depicted at FIGS. 8, 12, and 15, all of which have bands that only extend "substantially perpendicular."  FIGS. 1, 3, 5, 9, 10 and 13 are key to understanding the meaning of the disputed term "said angle is independently selected for each band."  Juzo proposes that the phrase "independently selected for each band" means "without consideration of the angle of any other band."  Dkt. No. 34 at 26.  While the Court appreciates that Juzo's proposed construction seeks to give effect to the word "independent," this interpretation is untenable in light of the preferred embodiments.  When looking at the preferred

1  embodiments depicted at FIGS. 1, 3, 5, 9, 10, and 13, it is evident that the bands that

2  extend at an angle are purposefully placed.  Take FIG. 5 for instance.



The '232 Patent at Sheet 4, Dkt. No. 35-1 at 6.  There is nothing haphazard about the

placement of these bands, and it is clear that the four bands placed "at an angle" were not

chosen in isolation from one another or in a vacuum.  By contrast, the bands that extend

"at an angle" complement one another.  As such, it would not make sense to adopt some

version of Juzo's proposed construction and to conclude that the band angles cannot rely

on one another, when each of the preferred embodiments with bands that extend "at an

angle" clearly contemplate some synchrony between the various angles.

Then again, the Court is also not satisfied with CircAid's argument — that is, that

no construction is necessary — because it does not resolve the claim dispute.  "A

determination that a claim term 'needs no construction' or has the 'plain and ordinary

meaning' may be inadequate when a term has more than one "ordinary" meaning or when

reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."  *O2 Micro*,

521 F.3d at 1361.  Here, the parties do not argue that the phrase "independently selected"

has any special meaning, but rather, they dispute the scope of the claim term and when

the claim term is satisfied.  *See id.*  Thus, it is the Court's role "to determine what claim

scope is appropriate in the context of the patents-in-suit."  *See id.*

Accordingly, the Court declines to adopt either parties' proposed construction and

instead concludes that a person of ordinary skill in the art, upon review of the intrinsic

record, would understand "said angle is independently selected for each band" to mean "said angle is individually selected for each band."[11]

**10. "each of said bands"/ "said opposing bands"/ "said plurality of bands"[12]**

The only bands described in the present invention are the "plurality of bands" introduced in Claim 1.  The '232 Patent at 16:12-17 ("a plurality of bands . . . each of said bands comprising . . . .")  Thus, Juzo argues, any subsequent reference to "each of said bands" (*id.* at 16:17 & 40), "said opposing bands" (*id.* at 16:31), and "said plurality of bands" (*id.* at 16:35), must necessarily refer to the "plurality of bands" disclosed in Claim 1, or else the scope of these terms would be uncertain and indefinite.  Dkt. No. 34 at 27 (citing *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370 (Fed. Cir. 2006)).  CircAid does not contest that the "plurality of bands" are the antecedent basis for these various terms, but instead, argues that the plain and ordinary meaning is sufficient to give the disputed terms meaning.  Dkt. No. 36 at 13.  CircAid adds that it would be "inappropriate to lump . . . all together" references to "said bands," "each of said bands," or "said opposing bands" given that their meaning is slightly distinct.  *Id.* Because the parties dispute claim scope, the Court must resolve the disagreement as a matter of law.  *02 Micro*, 521 F.3d at 1361.

The Court agrees with Juzo that these various references to "bands" must refer to the plurality of bands disclosed in Claim 1.  Accordingly, the Court concludes that the references to "each of said bands," "said opposing bands," and "said plurality of bands" must refer to the "plurality of bands" disclosed in Claim 1, as that is the only proper

---

[11] Because the Court rejects both parties' proposed constructions, it will not address the parties' dispute over whether the challenged term is a "structural" or "product-by-process" claim.  Juzo argues that its proposed construction is correct because the disputed term is a "product-by-process" claim, that is, one in which "the process details" become part of, or a limitation on, the "invention."  *See, e.g.*, *Abbot Laboratories v. Sandoz, Inc.*, 566 F.3d 128, 1291 (Fed. Cir. 2009).  However, because the Court finds Juzo's proposed construction untenable in light of the specification, and because the Court finds that the proper interpretation of the claim does not turn on whether it is a product-by-process claim, the Court will not wade into the dispute.

[12] Although Juzo's brief argues that the term "said bands" needs to be construed, the Court does not find any instance in which the term "said bands" appears without the preceding term of "each of." Accordingly, the Court construes, "said bands" as part of its construction of "each of said bands."

antecedent basis.  The Court, therefore, construes the terms as follows.  In Claim 1, "each of said bands comprising" is construed as "each of said plurality of bands comprising . . . ."  In Claim 3,  "the garment of claim 2 wherein said opposing bands extend . . . " is construed as "the garment of claim 2 wherein said opposing bands, comprising a plurality of bands, extend . . . ."  In Claim 4, "said plurality of bands" is construed as "said plurality of bands referenced in Section 1b are spaced-apart . . . ."  And finally, in Claim 5 "[t]he garment of claim 1 wherein each of said bands extend from . . . " is construed as "[t]he garment of claim 1 wherein each of said plurality of bands extend from . . . ."

**CONCLUSION**

For the foregoing reasons, the Court issues this claim construction order on the disputed terms.

**IT IS SO ORDERED.**


Dated:  March 13, 2017

Hon. Gonzalo P. Curiel
United States District Judge